FILED
IN OPEN COURT
JUL 23 2025
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ELISHA ODHIAMBO ASUMO,<br><br>*Defendant.* | Case No. 1:25-CR-102-2 (AJT) |

## STATEMENT OF FACTS

The United States and the defendant, ELISHA ODHIAMBO ASUMO (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. From at least in or about September 2022 through in or about April 2025, in an offense begun and committed outside the jurisdiction of any particular state or district of the United States, including in the Republic of Bulgaria and elsewhere, the defendant did knowingly combine, conspire, confederate, and agree with Peter Dimitrov Mirchev ("Mirchev"), Subiro Osmund Mwapinga ("Mwapinga"), and Michael Katungi Mpeirwe ("Mpeirwe"), and others known and unknown, to distribute and possess with intent to distribute, and to aid and abet the distribution and possession with intent to distribute, of five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, knowing, intending, and having reasonable cause to believe that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a), 960(a)(3), and 960(b)(1)(B), as well as Title 18, United States Code, Section 2.

2. In approximately late 2021, a Drug Enforcement Administration ("DEA") confidential source ("CS-1"), at the direction of DEA, contacted Mirchev and explained that CS-1 had a client interested in purchasing arms. Mirchev, who was a Bulgaria-based arms broker and supplier, expressed interest. Over the ensuing months, CS-1 had numerous phone calls and meetings with Mirchev, wherein CS-1 introduced CS-2. CS-2 posed as a "money guy" connected to various Mexican cartels who were interested in purchasing military grade weaponry. Over multiple meetings, CS-1 and CS-2 expressed interest to Mirchev in purchasing a variety of weapons, including guns and rocket propelled grenades. CS-2 stated that his clients "have to defend themselves against helicopters coming in to controlling landing sites." Mirchev discussed with the CSs various weapons he could supply to the CSs, covert methods of payment, and smuggling. Mirchev also discussed potential locations where the arms could purportedly be sent to, as well as the price for cocaine in Russia.

3. Mirchev supplied CS-1 with an arms brochure depicting a variety of weapons he could offer to CS-2's clients. The brochure included tanks, grenade launchers, machineguns, mortars, and air defense systems. Subsequently, Mirchev discussed with CS-1 the need to obtain fraudulent End-User Certificates to allow him to export the weapons while obfuscating the true destination of the arms. An End-User Certificate, or EUC, is a document provided by an arms purchaser to an arms seller in which the purchaser affirms that any arms purchased are for the purchaser's sole use and are not intended to be transferred to another user. EUCs are required by many governments, including the government of Bulgaria, in order to export arms.

4. CS-1 informed Mirchev that CS-2's clients were "the Cartel de Jalisco" and "the Cartel del Gulfo." At a meeting with Mirchev on or about July 28, 2022, Mirchev clarified if the Cartel members were "gangsters," to which CS-1 replied, "of course." Mirchev and CS-1

discussed the cartels sending drugs to the USA, and the similarities between what they were discussing and what Viktor Bout, a notorious arms trafficker and former associate of Mirchev's, was convicted of. Mirchev and CS-1 then had the following exchange:

| | |
|---|---|
| Mirchev: | "But, look. The USA can say these people, they supply with arms the cartels. The cartels, they produce drugs, and the drugs come to USA." |
| CS-1 | "Yes." |
| Mirchev: | "So, the supplier of the arms, they're enemy of the USA." |
| CS-1 | "Yeah, of course. And if, if you supply arms to Ukraine, you're enemy of Russia." |

CS-1 discussed how the cartels would likely use the arms to fight other drug cartels for territory or to protect their merchandise, but assured Mirchev that the cartel doesn't send guns to the U.S. CS-1 stated, "the arms are not going to the US. If something from Mexico goes to the US, it's drugs. That's what they do...They sell to Europe, and they sell to the US, and they sell millions, billions..." CS-1 described the CJNG as "the worst of the cartels...very intelligent, very violent, and they need a lot of arms, to be used in Mexico and to protect their assets."

5. CS-1 and Mirchev ultimately agreed to go forward with a deal to arm the CJNG, and planned to do a small test shipment to ensure the weapons could successfully be delivered before moving forward with a large order of weaponry. Mirchev directed CS-1 to contact the defendant to obtain a fraudulent End-User certificate for the deal.

6. CS-1 contacted the defendant and told the defendant that he was trying to broker arms deals with the Cartel del Golfo, Cartel de Sinaloa, and the "Cartel de Nuevo Jalisco." CS-1 described them as big players, spending "8-10% of their turnover on arms every year," and "they're shipping now over a billion U.S. dollars in drugs into America and Europe...so they have 80 million to spend every year." The defendant replied, "wow, that's a good budget." CS-1 said when

they sell the cartels weapons, they could charge very high prices and sell big quantities, because the alternative for the cartels was smuggling arms one at a time from the United States. CS-1 stated, "these cartel people make billions a year smuggling drugs to the U.S. So, why shouldn't we make 20 or 30 million on it?" The defendant agreed and discussed his corrupt contacts in various African countries to facilitate the export of the firearms.

7. In order to purchase the fraudulent EUC and pay the defendant and his co-conspirators for their work, the DEA wired the defendant funds. On or about October 6, 2022, the DEA wired the defendant $5,000 from an undercover bank account in the United States. On or about December 15, 2022, the DEA wired the defendant an additional $30,000 from an undercover bank account located in the United States. The defendant then introduced CS-1 to Mpeirwe. Mpeirwe stated that he and the defendant were working on acquiring an EUC. Mpeirwe noted that it "was very hard to do for something very small like this," but that they were willing to do it as "part of the bigger picture," meaning for additional, larger, and more lucrative arms deals with the Mexican cartels.

8. Mpeirwe brough Mwapinga into the deal to procure the fraudulent EUC. The defendant created a text messaging group called "collaboration" involving the defendant, Mpeirwe, and Mwapinga. Mwapinga was responsible for procuring the fraudulent EUC from the government of Tanzania. Mwapinga texted a "soft copy" of the EUC to the group and then arranged for a hard copy to be delivered to the defendant. The EUC provides a unique number for the transaction, and states that 50 AK-47s and 140,000 pieces of ammunition are sought from Bulgaria for the "sole use" of the Tanzanian Peoples Defense Forces and National Services via a Tanzanian company. A copy is below:

**THE UNITED REPUBLIC OF TANZANIA**

**MINISTRY OF DEFENCE AND NATIONAL SERVICES**

**END USER CERTIFICATE**

**MoD-EUSALW- // NIK/JVTZ-22/220323.**

We hereby declare that products declared by the chart made by **NIK AMMUNIATION** LTD from 32 ,General Gurko Street , floor 4, 800Burgas , Bulgaria has to be received by the Ministry of Defence and National Services of the Government of the United Republic of Tanzania of P.o. Box 2924 Dodoma Tanzania from **M/S JEVICE & ENGENEERING** of P.o.Box 13055 Dar Es Salaam The equipments at the below list will be imported into the United Republic of Tanzania under the Laws of the United Republic of Tanzania for the Sole use of Tanzania Peoples Defence forces and National Services and will neither be re-exported nor delivered to any third party without prior written consent of the **COMPETENT AUTHORITY OF THE GOVERNMENT OF BULGARIA.**

| Item No, | Product Description | Quantity |
|---|---|---|
| 1 | AK-47 | 50Pcs |
| 2 | 7,62x39 Cartridges | 140,000Pcs |

**Signed at Dodoma this 13th Day of December 2022**

.............................................................

**Dr. FARAJI KASIDI MNYEPE**

**PERMANENT SECRETARY**
**MINISTRY OF DEFENCE**
**AND NATIONAL SERVICES**
PERMANENT SECRETARY
MINISTRY OF DEFENCE
AND NATIONAL SERVICES
P.O. BOX 2924
DODOMA

9. The defendant sent the EUC to an address provided by CS-1 in Spain, where it was received by Spanish law enforcement and provided to the DEA. The DEA then mailed the EUC to Mirchev in Bulgaria.

10. Mwapinga relayed requests in the "collaboration" group chat for what he needed for the EUC. For example, on January 28, 2023, Mwapinga wrote, "[W]e need the following from them. 1. Letter appointing a local company logistics facilitator. 2. Details of the final receiver of the goods from the local logistics company. 3. Their logistics plan (dates when they intend to ship/

airlift the goods)." On February 1, 2023, Mwapinga wrote "request for their [Mirchev and CS] logistic plan and the authorization letter to the local company to register it."

11. On or about February 1, 2023, the defendant introduced Mwapinga via telephone to CS-1. Mwapinga vouched for the EUC's legitimacy and stated that he was "fully aware of what we're doing." The defendant explained that this first arms deal "was just a test" and that "if it goes through, all of us will be happy for the new list and for us to make money." Mwapinga replied, "I understand, I understand."

12. On or about March 27, 2023, CS-1 and CS-2 met with the defendant and Mwapinga in Cape Town, South Africa. Mwapinga again reiterated that he understood what the CSs were trying to do, and stated that he had a close connection to the government. Mwapinga explained the EUC process in Tanzania and the various officials who must approve. The CS explained again that they were working with Mexican drug cartels that supply massive quantities of drugs to the United States. CS-2 stated, "We are partners in this. I want you guys to make money, and I want to make money." The parties discussed how the cartels kill each other, and how the cartels can empty containers once sent. The defendant and Mwapinga recommended using cover loads likes tiles or used cars instead of leaving the shipping containers empty. The parties also discussed using East Africa as a transshipment point for cocaine, with CS-1 and CS-2 representing that they could move up to "twenty to forty keys a week," with "keys" referring to kilograms of cocaine. The parties also called Mirchev during the meeting and discussed export licenses.

13. On July 17, 2023, Mirchev sent CS-1 an invoice for the 50 AK-47 assault rifles and ammunition, with the recipient listed as the Tanzanian company on the EUC supplied by Mwapinga. The parties agreed that the weapons would be sent from Bulgaria to Greece and exported from Greece, where upon the cartel would divert the weapons to Mexico. On or about

October 19, 2023, CS-1 told Mirchev that CS-2 needed to delay because CS-2's people had a problem in Thessaloniki, Greece, due to a recent seizure of a half-ton of cocaine. On or about November 8, 2023, DEA transferred $32,058.59 to a Bulgarian bank account provided by an unindicted co-conspirator to pay for the weaponry. On or about November 9, 2023, the DEA transferred an additional $5,918.94 to this same Bulgarian account.

14. On or about February 28, 2024, CS-1 called Mwapinga to get a copy of the arms license for the company in Tanzania that was alleged to be receiving the weaponry on the EUC. Mwapinga sent a host of documents, including a Tanzanian license for the company, to CS-1.

15. On or about April 25, 2024, Mpeirwe met with CS-1 and CS-2 in London to discuss future illegal arms transactions to benefit the CJNG. CS-2 explained how the CJNG traffics large quantities of cocaine, methamphetamine, and fentanyl into the U.S., and specifically referenced the CJNG importing one ton of cocaine a day to the U.S. from Mexico via the Nogales Port of Entry. Mpweire told CS-1 and CS-2 not to worry about EUCs, explaining that by virtue of his diplomatic and military background, he had the network to acquire fraudulent end user certificates from every country in Africa.

16. On or about July 27, 2024, the weaponry purchased by CS-1 was transported from the Bulgarian arms company to a Port in Greece. Greek law enforcement covertly seized the shipment and turned over the 50 AK-47 assault rifles, 6,400 rounds of ammunition, AK-47 magazines, and additional items to the DEA. The DEA and Bureau of Alcohol, Tobacco, and Firearms (ATF) test fired the weapons and found them to be functioning, automatic weapons.

17. In September of 2024, CS-1 contacted Mirchev because a representative from the Bulgarian arms manufacturer requested a Delivery Verification Protocol for the July 2024 arms shipment. This document serves to confirm that the purported end user did in fact receive the

weapons. Mirchev stated that this document "should be included in the total payment" for the fraudulent EUC and that the defendant should provide it. On or about October 10, 2024, the defendant contacted Mwapinga to obtain the Delivery Verification Protocol. Mwapinga sent the document to the defendant, who provided it to CS-1, despite the fact that the weapons had never in fact been delivered to Tanzania.

18. In October of 2024, CS-1 and Mirchev continued to discuss the larger arms deal. CS-1 sent Mirchev a list of weapons, including for 2,000 AK-47 assault rifles, 68 rocket propelled grenade launchers, 19 Dragunov Assault rifles, 268 anti-personnel mines, 4 antiaircrafts guns (ZU-23), and various drones. The defendant and Mwapinga also received a copy of the list. Mirchev responded with an estimate of over €100,000,000. The parties ultimately agreed on a price of €53,000,000.

19. The defendant, Mpeirwe, and Mwapinga again agreed to provide arms export documents designed to obscure the true destination for these weapons. The defendant, Mpeirwe, and Mwapinga were in a group chat with CS-1 to schedule a meeting to finalize logistics for the deal, including how they would be paid ("nothing to smell...nothing online, untraceable"). In the group chat, CS-1 had to delay the meeting and sent two news articles to explain. The first depicted stacks of kilograms of cocaine with the headline, "Mexico navy seizes more than eight tonnes of illicit cargo in record drugs bust." Another article was about the seizure by the Mexican navy of 8,000 pounds of cocaine on a submarine. CS-1 assured the defendants, "like in the article, there is a [high] demand...it's active over there and even with those losses, the money is still good and demand even bigger." On March 26, 2025, CS-1 sent a news article titled "CJNG cartel: The murderous Mexico crime syndicate that was running a meth lab in Kenya." CS-1 asked the defendants if they knew if this was true and expressed surprise that the CJNG was working with a

substance other than cocaine. CS-1 also added that since CS-2's people were already in the area, perhaps they could further make money together. Mwapinga stated they would "check across our networks," and the defendant stated, "This is true....We can't chat about it here!" CS-1 then had a call with the defendant and Mwapinga wherein they discussed shipping the weapons out of Bulgaria to Tanzania, where CS-2's people—the CJNG—could take control of the weapons since they were already in the area. Mwapinga stated it would be very easy and they've done similar things before.

20. On or about April 8, 2025, the defendant arrived in Morocco for a planned meeting with Mpeirwe, Mwapinga, and CS-1 in Morocco. The purpose of the meeting was to finalize the deal for supplying fraudulent export documentation to allow weaponry to be exported to the CJNG in Mexico. The defendant was placed under arrest in Morocco by Moroccan law enforcement.

21. The CJNG is a transnational organization with a presence in nearly every part of Mexico. In addition to trafficking cocaine, fentanyl, and other drugs, the group engages in extortion, oil and mineral theft, and the weapons trade, among other illegal activities. The group has contacts across the Americas, as well as in Australia, China, Southeast Asia, and elsewhere. The CJNG has conducted intimidating acts of violence, including attacks on Mexican military and police with military grade weaponry, the use of drones to drop explosives on Mexican law enforcement, and assassinations or attempted assassinations of Mexican officials.

22. On or about March 11, 2026, the defendant was first brought from Morocco to the Eastern District of Virginia. The defendant agrees that venue is proper in the Eastern District of Virginia pursuant to 18 U.S.C. § 3238.

23. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the

defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

24. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

Date: July 2, 2026

By: [signature]
Edgardo J. Rodriguez
Anthony T. Aminoff
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, ELISHA ODHIAMBO ASUMO, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

______________________________
ELISHA ODHIAMBO ASUMO

I am Andrew M. Stewart, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

______________________________
Andrew M. Stewart
Attorney for ELISHA ODHIAMBO ASUMO